1840.

Bullock
v.
Boyd et al.

BULLOCK v. BOYD et al.

ALTHOUGH in England, when accounts are surcharged or falsified as to particular items, the party may surcharge and falsify at large, yet in New-York he is restricted to erroneous items pointed out, provided they have arisen from error or mistake; but if these really cast suspicion of unfairness on the whole account, the liberty should be unrestricted.

On a loan of credit or name, (not of money,) on notes running on time, a commission taken for it, not exceeding the legal interest, does not amount to usury, even where the parties lending their name get an old debt guaranteed as a further consideration.

If a promissory note is dated before the 1st of January, 1830, and sued on afterwards, the interest is to be computed at 365 days to a year to that date, and 360 days subsequently.

Although the rate of interest is governed by the law at the time of the loan, yet a subsequent law, which varies the rate, will affect it where the loan is not paid, and there is a continued refusal or neglect to discharge it. The interest will be calculated at the old rate down to the repeal of the old act, and afterwards at the rate mentioned in the new statute.

The doctrine of retrospective statutes examined.

A commission of 2½ per cent. may be charged on advances made in expectation of receiving merchandise to sell.

Cases considered in relation to a surety with or without consideration, taking the defence of usury.

All defences available to the principal are available to the surety.

Where a consignor lives in Canada, and his consignee in New-York, the business is to be considered foreign; and the latter may charge 5 per cent. commission. In cases not considered foreign, the rate would be 2½.

Jan. 13, 14, 21.

THE bill in this cause sought the correction of various accounts, in which the defendants stated a balance to be due to them from the complainant, on account of monies received from certain property assigned as security; payment of a balance due him as alleged upon the transactions; and a surrender of various collateral securities held by him, as well as certain vouchers of indebtedness.

*Mr. Gerard*, for the complainant.

*Mr. Foot*, for the defendants.

THE ASSISTANT VICE-CHANCELLOR :—The questions in the cause arise under two classes of accounts; the one, those between the complainant and defendants personally; the other, those between Boyd & Suydam, and William Lampson, Jr., whose debt to Boyd & Suydam, the complainant had guaranteed.

1st. As to the former. In the month of November, 1827, the complainant applied to Boyd & Suydam, to aid him and Wm. Lampson, Jr., in a purchase of an interest in certain property called the King's Port Fur Company, in Lower Canada. A proposition was made to them, to become interested in the concern, but which they declined. Bullock and Lampson then applied for aid, by the credit and security of the defendants; and it was agreed, on the 10th of November, 1827, that they would accept the drafts of Lampson in favor of Bullock, for $40,000. Eight drafts were made in pursuance of this agreement, and accepted, the average period of payment being nine months. The joint and several promissory notes of Bullock and Lampson for the same sum, were given to such defendants, payable in one year with interest after nine months. And it was made part of the agreement, that Bullock should guarantee the debt then owing by Lampson to such defendants. It was also agreed, that the defendants should receive five per cent. commission for advancing their credit, and a note was accordingly given for $2,000, which was to be paid at maturity.

As security for the $40,000, Lampson and Bullock undertook to procure a lease from the Earl of Dalhousie of certain property and privileges called the King's Ports, to be assigned to the defendants, which agreement is set forth in the answer. And upon this instrument, and on the same day, viz. the 10th of November, 1827, Bullock endorses a memorandum " that in consideration of Boyd and " Suydam having made the acceptances mentioned in the " preceding memorandum at my request, I do hereby pro- " mise and agree to guarantee to the said Boyd and Suy- " dam, the pay of all and every the sum or sums of money

" now due and owing by the said Wm. Lampson, Jr., to " the said Boyd & Suydam within one year from the date " hereof."

On or about the 25th of May, 1829, an account is made out by Boyd & Suydam and rendered to Bullock, in which he is found indebted in the sum of $32,272 99. For this sum he makes seven promissory notes, dated 20th, 25th, and 30th of May, 1829, at four, five, and six, months, and in which the interest for the time they had to run is included. These balanced the account precisely ; that is, deducting the interest from their face, the sum is $32,272 99.

I have stated that the account was rendered to Bullock, and the notes given by him in liquidation of the balance. The bill expressly states that they were not given in settlement, but to raise money for the accommodation of Boyd & Suydam. The answer is responsive and very explicit.

This account is marked No. 1, annexed to the bill.

On the 21st of February, 1830, another account was made out, marked No. 2, bringing the items down to the 10th of March, 1830. In the interim, one of the notes given upon the settlement had been paid by the complainant ; and in this new account the remaining notes are charged to him. Various other charges are made, some of which will be hereafter noticed, and various credits given, and the balance struck, as of the 1st of March, 1830, is $14,507 30. The answer avers that this account was rendered to the complainant about the 20th of February, 1830, and Mr. Sage deposes to that effect. It is not perhaps clearly proven to have been rendered, as the cross-examination shows that Mr. Sage speaks from the course of business and strong impression. The probability however, is, that it was rendered. And decisive evidence is not very material, as the subsequent account was clearly in his hands. About the 1st of February, 1831, another account was made out (exhibit No. 3 in the bill,) in which the prior balance of $14,507 30, is brought forward ; other items on each side are added, and a balance found

due of $16,604 55. Upon this account the complainant signed an acknowledgment: "I acknowledge the above "account to be correct, and the balance therein stated to "be their just due. New-York, 7th February, 1831."

Now the complainant by his allegations in the bill respecting the mode in which this acknowledgment was obtained, has made whatever the defendants have answered evidence against him.· And it is therefore to be regarded as proven, that he made a full examination of the account before signing the acknowledgment; that he had a copy in his hands two or three days before settling it, and was apprized of all the facts necessary for a clear understanding; and has not complained of it until the bill was filed about two years afterwards.

The last account, No. 5, brings the accounts down to the 6th of February, 1833, and certain credits being given for proceeds of part of the securities, the balance claimed by the defendants is $4,921 82.

In my opinion, a court of chancery should rarely and with great reluctance interfere in readjusting accounts once deliberately settled between parties aware of their rights and competent to protect them. While its utmost rigor should be exercised wherever there are indications of imposition, misrepresentation, or concealment, it should avoid disturbing settlements, even upon the ground of errors, if they are apparent on the face of the accounts, and the party could not but be aware of them. The inference may well be drawn that he submitted to such errors for the sake of an adjustment, and had compensation in some other and satisfactory manner.

It is true that in the present bill no attempt is made to open the accounts at large, but only to surcharge and correct them. There is no allegation of fraud, concealment or misrepresentation. And the imputations in these matters which are put forth as improper acts of the defendants, such as taking and charging the notes, are amply refuted by the answer and testimony.

The court in England has gone the length of holding, that where an account has been surcharged or falsified in

1840.

Bullock
v.
Boyd et al.

one or more items, the complainants may go into the master's office with liberty to surcharge or falsify it at large. This doctrine has met in our state with this restriction, that the account can only be corrected in the items which the bill points out as erroneous or alleges should be supplied. Something must depend I conceive upon the character of the items stated in the bill and in which the account is proven to be wrong. If they tend to cast a suspicion of unfairness upon the whole, the liberty should be unrestricted ; if they may be justly considered as arising from error or mistake, it should be restrained. (See *Ex parte Townsend,* 2 *Molloy,* 242. *Davis* v. *Shirling, Tamlyn,* 213. *Philips* v. *Belden,* 2 *Edwards,* 1. *Kinsman* v. *Barker,* 14 *Vesey,* 579. *Johnson* v. *Curtis,* 3 *Br. C. C.* 266, Belt's ed. Lord Colchester's note of the case *Brownell* v. *Brownell,* 2 *Br. C. C.* 62.) It is, however, well settled, that however solemnly accounts have been adjusted which contain usurious charges they will be corrected by this court ; indeed that money so overpaid must be accounted for. The relief seems open until a judgment has been obtained, or an award made and performed. (*Bosanquet* v. *Dashwood, Ca. Temp. Talb.* 37. *Ex. of Radcliff* v. *Wightman,* 1 *M'Cord's Ch.* 408. *Dey* v. *Dunham,* 2 *Johns. C. R.* 191. *Hinckle* v. *Royal Exch. Ass. Co.* 1 *Vesey, sen.,* 317.) This leads to the inquiry into the nature of the objections to the accounts.

1. The first objection to the first account (No. 1,) is, that there should be a credit of the sum of $2,000, the commission paid upon the transaction. The counsel conceded that this item of allowance standing alone was not usury. It amounted to less than the interest for the nine months, the average period of the running of the acceptances, by one hundred dollars. The transaction was clearly a loan of credit, not of money, and the cases of *Dey* v. *Dunham,* 2 *Johns. C. R.* 191. *Fanning* v. *Dunham,* 5 *Johns. C. R.* 122, and *Dunham* v. *Gold,* 16 *Johns. Rep.* 367, have established the distinction that where the commission does not exceed legal interest for the current time of the notes, it is not usury ; if the amount is greater, it is.

But it is insisted that this commission, coupled with the assumption or guarantee by Bullock of the debt of Lampson, rendered the transaction usurious. It is admitted that this assumption was a part of the agreement. I am clearly of opinion that there was nothing in this to invalidate the transaction. The defendants by the operation were never to receive more than legal interest upon a just demand. The cases cited by counsel prove only that even where the reception of the usurious amount depends upon a contingency, the case is within the statute. But something is to be obtained for the use of principal, without risking the principal, beyond lawful interest. The decision of the vice-chancellor in *Lenox* v. *Dowdell*, (2 *Edw. Rep.*) seems to me sound and conclusive.

II. The account is next questioned, because notes were taken in liquidation of the balance. The result of this transaction is, that interest is chargeable upon the face of the notes from their maturity, and as they included interest for the period of their running, compound interest was received.

The answer most clearly establishes that the account was rendered and the notes given, in its liquidation. Nothing is better settled, than that a party will be bound by such an adjustment. It is not usury, and furnishes no ground in itself for unravelling or correcting the account.

III. But the objection next urged is of a different character. The calculation of interest is made by taking the year as consisting of 360 days. On the note of $40,001 50, (principal and protest,) the interest charged is $995 58. If the computation had been made at 365 days to the year, it would have been $981 95. The other item of interest, $973 74, is also erroneous on the same principle. I presume that this error pervades all the subsequent calculations. Some few I have tested. It was settled in many cases in our courts, that this mode of computing interest, rendered a security usurious. (*Bank of Utica* v. *Wager*, 2 *Cowen*, 770, and *Same* v. *Tellman*, 1 *Wendell*, 555.) As before observed, the account No. 2, was most probably

rendered to the complainant, and is made out in February, 1830; and the next account, No. 3, the one signed and acknowledged by him, was made out in February, 1831. On this state of facts, an important question arises under the Revised Statutes.

By the 9th section of the act " of the interest of money," it is provided, that "for the purpose of calculating interest, " a month shall be considered the twelfth part of a year, and " as consisting of thirty days ; and interest for any number " of days less than a month, shall be estimated by the pro- " portion which such number of days shall bear to thirty." It is to be noticed, that this provision went into effect on the 1st of January, 1830, by force of a statute passed the 10th of December, 1828, having in fact passed the legislature on the 4th December, 1827.  (2 *R. S.* 659.)

I am of opinion, that when an account is stated, after this provision went into effect, including items arising before, the interest may be computed in the manner therein directed, upon the prior as well as upon the subsequent items, from the passage of the act.   The terms of the section are sufficiently comprehensive for this.  They are, " for the purpose of calculating interest, &c."   The only objection is, whether an unlawful retrospective effect is thus given to the statute.

To put the point more clearly.  If a promissory note was dated before the 1st of January, 1830, and was sued for afterwards, the interest should be computed at 365 days to a year, for the time down to that date, and 360 days subsequently.   The statute in question does in effect raise the rate of interest.   Suppose it did so in terms changing it to eight per cent., and then a prior demand is sued upon.   Now where interest is not specified in a contract as part of it, it is allowed as damages for the refusal to pay the debt.  (15 *Wendell*, 80.)   The rate of interest is undoubtedly subject to the existing law, during the continuance of that law.   But is there any implied contract between the parties, restricting the interest to such rate ? A fresh demand of the debt, and a refusal, is a new assertion of a right, and imposes a new liability upon the

party; so does a neglect without a new demand. The damages are imposed for this renewed violation of a contract. I do not perceive that in this the great principle of treating statutes as prospective only in their operation, is infringed. The new law takes effect upon a new violation of an obligation. It has no retrospective effect upon previous rights. The previous right was to discharge the debt with interest, at a given rate. That right has not been asserted. By the general rule of law, if there was no statute regulating interest, damages of an uncertain amount would be recoverable for the detention of money, as for that of any other property. The statute then prescribes, that for the continued refusal or neglect to discharge the debt, those damages shall be at another rate of interest. There are some English cases which bear upon this question.

By the terms of the act, (2 *Char.* 2,) no person, from and after the 29th of September, 1660, upon any contract shall, from and after the said 29th of September, take, &c., more than at the rate of six per cent. The interest under the previous act was eight per cent.

In the case of *Walker* v. *Penry*, the point was whether, where interest upon a mortgage made before the statute had been paid at the rate of eight per cent., so much of the extra two per cent. as accrued after the act of 1660, should be applied in reducing the principal. The mortgagee had entered in 1675. Lord Chancellor Jeffries decided that the statute had reference only to subsequent contracts, and would give no relief; but he gave interest at six per cent. only, from the entry in 1675. On a rehearing he adhered to this opinion, (see 1 *Vernon*, 42 and 78.) Mr. Ord cites this case as settling that the statute had no effect upon prior contracts, (on *Usury*, p. 40,) and Mr. Comyn treats the question as undecided. The latter writer notices, however, the subsequent reversal of the decree upon a bill of review. (See 1 *Vernon*, 145.) Both writers have omitted to state that the case was first determined by Lord Nottingham upon a bill of foreclosure, who held that the extra two per cent. should go towards

reducing the principal. Then upon a bill to redeem, Lord Jeffries determined as before stated. Upon the bill of review Lord Commissioner Trevor said : "being there "was a decree already made, he would not reverse :" but Lord Rawlinson and Hutchins held that the act had a retrospect, and makes it unlawful to take more than six per cent. upon any contract, whether made before or after the act of parliament. The note of the decree in Mr. Raithby's edition, plainly shows that they meant six per cent. after the new statute of 1660.

Thus, so far as this case goes, we have the authority of Lord Nottingham and commissioners Rawlinson and Hutchins, against the opinion of Lord Jeffries.

But there is also the express authority of Sir Matthew Hale to the same effect—*Hedworth* v. *Primate, Hardress*, 318. By Hale, chief baron—" since the new act which re-"duces interest to six per cent., more shall not be allowed "upon any contract, though made before the statute, by "reason of the words of the statute which are, &c." He then notices the difference in the language of that act, and that of the 21 Jac. 1, cap. 27.

His observations reconcile also the position in 1 Eq. Ca. Ab. 288, pl. 1, and in Hawkins' Pleas of the Crown 82, § 10, that under the statute of usury, 12 Ann, c. 16, there was no retrospect to any debt contracted before its passage. The language is express, limiting its operations to contracts made after the 29th of Sept., 1714.

There is another case (*Procter* v. *Cooper, Prec in. Ch.* 116,) in which the master of the rolls held upon a bill to redeem a mortgage made before 1660, that interest should be allowed at 8 per cent. only to the time of the passage of the act. See *Bodley* v. *Bellamy,* 1 *Wm. Blackst. Rep.* 268.

The case of *Fowler* v. *Chatterton,* (6 *Bingham,* 258,) is also of weight upon this question. By an act of 9 George IV., c. 14, called Lord Tenterden's act, passed May 9, 1828, it was provided, that in actions of debt, or in case grounded on any simple contract, no acknowledgment or promise by words only should be sufficient evidence of a new or continuing contract whereby to take any case out

of the enactments of the statute of limitations, but such acknowledgment or promise must be made or contained by or in some writing signed by the party chargeable thereby. The act also contained a provision that it should not go into effect until the 1st of January, 1829. The action was assumpsit, and commenced in Hilary term, 1829. The debt was then of more than six years standing. In February, 1828, a declaration was made by parol to pay under instruction from the judge to find upon that point. The judge then nonsuited the plaintiff on the ground that the promise should have been in writing under the statute. The court of common pleas refused to set aside the nonsuit. Two other cases are cited in the judgment upon the same statute, to the same effect. One of them was before Lord Tenterden where the action had been brought before the statute went into effect, though not tried till afterwards.

I have carefully read the leading cases in the courts of our own country upon the subject of retrospective statutes, especially *Dash* v. *Van Kleeck*, (7 *Johns. Rep.*, 477,) in which the strength of the old supreme court of our state was fully put forth. I see nothing in the principles there advocated, or the decisions there made to change the result I have arrived at. (*Calder* v. *Bull*, 2 *Dallas*, 386. *Bedford* v. *Shilling*, 4 *Serg. & Rawle*, 401. *Woart* v. *Winnick*, 3 *N. Hampshire Rep.* 473. *Hackley* v. *Sprague*, 10 *Wendell*, 113. *Sayre* v. *Wisner*, 6 *Wendell*, 663.)

The result is that the accounts Nos. 1 and 2, must be corrected by computing the interest at 365 days down to the 1st of January, 1830.

IV. The account No. 2, is next questioned upon the ground that a commission of 2½ per cent. is charged upon an advance of $5,000, and the same upon the sum of $2,500.

The answer as to these items is merely that the defendants did, in their business as factors and commission merchants, advance to the complainant at his request in their business on commission of 2½ per cent., being the usual

commission in such business, the sums aforesaid, (fol. 77.) It is not stated that they did this on the faith or promise of a consignment of goods to them, which statement is expressly made as to the advances by Boyd, Suydam & Co., of $5,000 on the 20th of April, contained in account No. 4, (fol. 130.) I have carefully compared the different parts of Mr. Sage's evidence upon this head; and I am not satisfied that any promise to consign goods as the consideration of these advances was ever made. The question therefore does not arise whether the allegation as it stands in the answer would have warranted any testimony to the point. It appears to me that these items of $125 and $62 50, in account No. 2, must be stricken out.

And as to the items of the commission on the sum of $3,000 February 7th, and $5,000 April 20th, in the account with Boyd, Suydam & Co., the case as to the first item stands as it does to the before mentioned sums of $5,000 and $2,500. The answer avers no more than it averred as to these. But as to the $5,000 item, it is stated that the complainant promised to send furs to the defendants to be sold as commission merchants, and the advance was thereupon made. The charge in the account is "an advance on furs." It may be questionable whether the answer is in this respect responsive—but the item as it stands in the account is unobjectionable, and the complainant has not shown that the fact was otherwise. In this account the commission of $75 on the $3,000 must be stricken out.

The law on this branch of the case was not contested. A commission of 2½ per cent. in addition to interest may be charged upon advances made in expectation of a *bona fide* transmission of property to be sold on commission; (*Trotter* v. *Curtis*, 19 *Johns. Rep.* 100. *Fanning* v. *Dunham*, 5 *Johns. Ch. Rep.* 135.)

V. The remaining objection taken to these accounts relating to the three notes of Wells & Redfield, endorsed by Bullock, amounting to $1,837 50. The complainant states in his bill, that the notes were discounted by the defendants, who gave for them $1,732 16. The state-

ment of the further answer is, that interest was deducted from the face of the notes, and then a commission of 2½ per cent., amounting to $44 43, was also deducted. The complainant in his bill insists that only the sum given for the note with interest, can be recovered. This position seems fully warranted by the case of *Cram* v. *Hendricks*, (7 *Wendell*, 569,) and the account must be so corrected. This disposes of the objections to the accounts with Bullock.

2. The second general subject for consideration, is the account of Boyd & Suydam with Lampson. I have before stated, that the complainant became the guarantee of the debt owing by Lampson, and have set forth his written agreement to that effect. It is in evidence, that on the 10th of October, 1827, a month prior to the transaction between the parties respecting the $40,000 note, Lampson signed an acknowledgment at the foot of an account, of its being correct, and the balance of $27,593 04, being justly due.

The complainant makes an allegation in his bill, that the assumption had been hurriedly obtained from him, and upon a representation that the debt was but $8,000. This is most explicitly and fully put down in the answer and proof; the true state of the account was made known to him, at any rate that it was greatly larger than $8,000, although by possibility it might be reduced down to that sum. It also appears that in November, 1828, the balance due by Lampson was reduced to $13,755 34; Lampson draws upon Bullock for this amount, who accepted the draft. I think it may be assumed, that at the date of this acceptance, Bullock had seen the account with Lampson, and that the acceptance was given knowingly, for the balance of such account. In May, 1829, Bullock accepted another draft for the amount of the former, with interest. And in November, 1829, he accepted a third for $10,350, and authorized the defendants to charge him with the balance due on the former draft, which was done. Thus it may be concluded, that the complainant had ample information, or the means of ample information, as to Lampson's

debt when he assumed it, and when by his acceptances he recognized his liability. There can be, therefore, no reason in this case, if in any, for giving greater latitude to a surety in opening an account, than to a principal. I see no reason, however, upon general principles, for restricting that latitude.

. But it is urged by counsel that a third person, surety or otherwise, whose relation arises, or whose liability is created after the contract or transaction which is tainted with usury, cannot avail himself of such a defence : And in the present case, all or nearly all of the items objected to, are impeached upon the ground of usury.

There are numerous authorities to the point, that no substituted security given to an original party, even upon the consideration of a longer credit, can purge an usurious contract. If an usurious lender can screen himself by giving up the original security and substituting another, the statute could easily be evaded.

Thus in *Bridges* v. *Hubbard*, (15 *Mass.* 96,) Blanchard & Fordmen were the makers of a note tainted with usury, the defendant being an endorser. When called upon to pay, he asked for a larger credit, and the vendor and holder of the note, Eaton, agreed to give it upon obtaining further security. A new note was then given by Hubbard, the defendant, to one Sudley, and endorsed over by him to Eaton, from whom it came to the plaintiff. This note was held void, Jackson and Putnam, justices, dissenting.

*Bottsford* v. *Sandford*, (2 *Conn. Rep.* 276,) and *Waley* v. *Webb*, (5 *Conn. Rep.* 154,) are to the same point.

These cases do not affect the rule, that if the borrower gives to an innocent holder of a tainted security a new obligation in consideration of a further credit, the new security will be valid.

I have found but few cases in which the question has arisen upon a security given subsequently by a stranger. *Harrison* v. *Hannel*, (5 *Taunton*, 780,) and *Turner* v. *Hughes*, (4 *Esp. N. P.*,) cited by the defendant's counsel, are among them. In the former case, usurious transactions had taken place between the plaintiff and the son of the

defendant, on which the latter was indebted. He obtained a further advance of £150 from the plaintiff, upon unexceptionable terms, but as a condition of doing so, the son was to obtain the defendants' acceptances for £100 at nine months, £100 at six months, and £50 at three months, as security for the whole of the debt, part of which, viz., £90, and £20, were legally due, the rest was illegal. Although the whole £250 acceptances would not cover the £260 lawfully advanced, yet there was no distinct application of them, and it was held in an action, that the defence of usury could be sustained. Gibbs, C. J., said,—If a man lends £1,000 on usurious interest, and gets from a third person a collateral security for £800 only without usurious interest, I hold that security is void; not because it is given for securing usurious interest, but because given for enforcing a contract for usurious interest.

With respect to the case of *Turner* v. *Hughes*, Chief J. Parker says, in *Bridge* v. *Hubbard*, that if its principle be correct, it would be idle to attempt to execute the statute of usury. It meets with equal disapprobation in the Connecticut cases.

In *Tuthill* v. *Davis*, (20 *Johns. Rep.* 285,) the note on which the suit was brought was given by a different party, to take up a former note on which there was usury. It was given to the original party to the usurious contract, without any new consideration, but as it included the extortionate interest, it was held infected and void.

In *Thomas* v. *Catheral*, (5 *Gill & Johns.* 23,) a stranger guaranteed the payment of a usurious note after it was put in the hands of an attorney to sue upon, and he was allowed to take the defence.

It must be observed that in none of the above cases, was there any consideration between the lender and the new party at the time of his guaranty. In all of them the assumption was purely voluntary. But here the undertaking of Bullock was expressly in consideration of Boyd & Suydam having given their credit for the $40,000 at his request. Unquestionably this is a very important distinction. But looking at the engagement of the surety,

we find it to be an agreement to pay the sums of money then due and owing from Lampson. This imports and can import only what was legally due and owing. Suppose that the debt had actually then been acknowledged by Lampson, and a note given for the amount and produced to the complainant, it would be sufficient to hold that *prima facie* this would be evidence against him as well as against the principal : and so where an account is exhibited to him before or at the time of his assumption, it may be sufficient in the first instance. But it is a familiar doctrine that all defences available to the principal are available to a surety ; and I see no reason for not giving every relief to a surety, whose obligation is *strictissimi juris*, which can be given to his principal.

The inquiry then is as to the validity of the items objected to in Lampson's accounts.

The first objection is one already discussed as to the calculation of interest at 360 days to the year. I have tested the account in a few cases, and find the interest is thus computed, and not only upon the advance but upon the commission added. The account down to January 1st, 1830, must be corrected in this particular.

The next and a very important question arises upon the charges for advances and for selling the goods.

It was on the argument assumed to be the fact that all the advances on the first account commencing Dec. 5th, 1826, were on account of goods sent, or to be sent. It will be noticed, that by the estimate of the parties as stated in their answer and communicated by Bullock, and as corroborated by Sage, the goods in hand in Nov., 1827, were expected to reduce the debt down to about $8000. The beaver sold at a reduced price, and the fox skins were delivered to the complainant.

But what renders the matter sufficiently plain, is that by examining the account it will be found that the $937 deducted in pencil at the foot of the account, and referred to by Sage in his testimony, is the amount within a few cents of the commission on the drafts in favor of C. M. Lampson, viz : three sums of $108 47 each, and three

sums of $203 each, making $937 26. This sum, $937, was clearly deducted when the account was made up, because the balance carried forward, and for which a note is said to have been taken, is $41,557 55, being the balance, July 12th, 1827, after deducting the $937. Then we find that all the other commissions in the account are distinctly charged as for an advance on furs, or *shipping furs*. We find also that the balance of the debits, after deducting these drafts, is in favor of C. M. Lampson, and all the commissions, is about $61,026, and the account sales are $49,729, exclusive of the credits by notes which probably were for sales also. At any rate it appears that there was a quantity of furs on hand in July, 1817. From all these circumstances, I consider myself justified in holding that all the commissions in question in this account are charged for advances upon goods consigned to the defendants, or to be consigned to them, as factors and commission merchants.

So far then as these accounts contain the charge of $2\frac{1}{2}$ per cent. commission on these advances, they are unobjectionable.

But it appears that a commission of $2\frac{1}{2}$ per cent. was also charged upon the sales of the goods. This commission is deducted in the account sales, and the balance after such deduction is carried into the account current before referred to. I think this of little moment. The account sales is dated the 9th July, 1827, and the account current the 12th of the same month. They came from the complainant's possession; obtained no doubt from Lampson, to whom they were rendered. There was no surprise therefore, upon Lampson, or concealment of a material charge from him. And the question is, whether this charge is usurious.

The whole current of the testimony establishes that 5 per cent. is the usual commission upon foreign business, and $2\frac{1}{2}$ upon domestic. The question seems to turn upon the point, whether the facts of the correspondent Lampson living in Canada, and the goods coming from Canada, renders the business foreign or domestic, as to the rate of

commissions.   The little testimony adduced to this point is that of Mr. Cotheal and Mr. Kennedy, both of whom treat the business as strictly foreign, being out of the United States.   Kennedy rejects the idea of counsel that the question is whether the goods are dutiable or not. Five per cent. is chargeable in either case.   But he says they must in either case pass the custom-house in foreign business.   The manifest of these goods from Canada must have been duly delivered to the collector at the place at which they were brought in, and have passed the custom-house in the usual form.   (*Ingersoll's Ab.*, p. 229.) Whether they are dutiable or not, I do not know; but at any rate, the criterion thus given by Mr. Kennedy applies in this instance.   And although the house here had no agency in thus passing the goods, that does not appear to me to take away from the business its foreign character. There is not therefore ground enough to hold that this charge was usurious.

III.   As to the item of $1,038 93, a commission of 2½ per cent. on the old balance for which a note was taken, I am at a loss to find the slightest reason to support it.   This must be stricken out.

No other objections in the subsequent accounts have been pointed out except as to the mode of computing interest at 360 days.

The decree will provide for the correction of the accounts upon the principles before stated, and a reference to a master for that purpose if required.   Upon payment of the balance which shall then be found due, the securities and vouchers in the hands of the defendants to be delivered up; each party to pay his own costs.